2025 IL App (1st) 231844-U

SIXTH DIVISION

March 21, 2025

No. 1-23-1844

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| KENNETH TRIPP, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 16 L 1767 |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | Honorable |
| | ) | Bridget J. Hughes (trial) and |
| Defendant-Appellee. | ) | John A. Ehrlich (motion) |
| | ) | Judges, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    ***Held:***    We reverse the jury's verdict for appellee and remand for a new trial because the circuit court abused its discretion by not barring admission of surveillance video as a sanction for appellee's discovery violations. We also reverse the circuit court's grant of summary judgment on appellant's claim under the Safety Appliance Act

(49 U.S.C. § 20302) (1994) because the record on summary judgment demonstrated there were genuine issues of material fact.

¶ 2    Appellant Kenneth Tripp sued his former employer, appellee Union Pacific Railroad Company (UP), for damages allegedly suffered because of a fall he sustained while at work on March 10, 2015. Following a lengthy pretrial process, during which the circuit court granted summary judgment to UP on Tripp's claim under the Safety Appliance Act (SAA) (49 U.S.C. § 20302 (1994)), the matter went to a jury trial, after which the jury ruled in UP's favor on Tripp's claim under the Locomotive Inspection Act (LIA) (49 U.S.C. § 20701 (1994)). Tripp appeals, alleging myriad claims of error regarding the admission of certain evidence and testimony, as well as judicial bias, and a separate challenge to the summary judgment ruling. For the reasons explained below, we find that the circuit court abused its discretion by permitting UP to admit surveillance videos despite its failure to disclose and produce the videos, an issue which significantly prejudiced Tripp such that remand for a new trial is necessary. We also find that the circuit court judge who granted summary judgment on the SAA count erred and accordingly reverse the grant of summary judgment.

¶ 3                                BACKGROUND

¶ 4    This court ruled on an interlocutory appeal in this matter. In that order, we adopted the circuit court's summary of the basic facts underlying the suit as follows:[1]

"On March 8, 2015, locomotive 8516 (UP 8516) arrived at Union Pacific Railroad's Global I yard in Chicago ***

---

[1] In that order, we found that both UP 8516 and UP 7269 were "in use" as required for application of the LIA. On this appeal, Tripp raises multiple theories on how that order was circumvented by erroneous circuit court rulings at trial; we do not reach these arguments, however, as will be explained below.

*** On the night of March 9, 2015, [a second locomotive,] UP 7269[,] moved to the yard's maintenance pit area. Either before or after the move, UP 7269 was coupled with a second engine to form a 'two pack.'

At the Global I yard, the maintenance pit is located below a line of track specifically designated for maintenance work. The pit is five feet below-grade and permits maintenance machinists to work beneath the elevated locomotives. ***

On March 10, 2015, Kenneth Tripp was working as a Union Pacific conductor at the Global I yard *** At approximately 2:30 a.m., and as directed by Union Pacific, Tripp served as conductor and Jeff Mapp served as the engineer in moving UP 8516 onto the yard's maintenance pit track. UP 8516 had already been coupled with two other engines to form a 'three pack.' Tripp had been instructed to couple UP 8516 — the three pack's lead engine — to UP 7269 — the two pack's lead engine - and then push all five locomotives to the end of the maintenance pit area. ***

Locomotives are linked together through coupling devices located at the end of the locomotive. A coupling device consists of a knuckle joined at the end of a drawbar that is attached to a housing mechanism on the railcar. The knuckle is a clamp that interlocks with a knuckle on another railcar to join the two together. Railcars cannot be joined if both knuckles are closed; consequently, railroad workers must open at least one knuckle before coupling railcars together." *Tripp v. Union Pacific*, 2020 IL App (1st) 1190279, ¶ 5.

¶ 5    Tripp filed his complaint on February 19, 2016, pursuing, in relevant part, count II for a violation of the SAA and count III for a violation of the LIA. He alleged that on March 10, 2015, he "was attempting to recouple and was required to pull pin lifts to re-open the knuckle, and slipped off the locomotive stairs." On count II, he alleged the SAA "imposed upon [UP] the absolute duty to have all cars that it hauls or permits to be hauled or used on its line equipped with couplers,

3

which when opened remained opened and which couple automatically upon impact. The statute is violated when a coupler fails to function properly." Tripp alleged UP breached this duty by permitting a locomotive on its yard to have "an automatic coupler that failed to perform properly," an act that caused Tripp's injuries in whole or in part. On count III, he alleged UP was "under an absolute duty to maintain its locomotives in safe and proper conditions," but failed to do so. Tripp filed his third amended complaint, the operative complaint here, on November 2, 2018, again raising counts II and III related to the SAA and LIA. Regarding the LIA violation, he included an allegation that UP provided an engine with a "defective gladhand."

¶ 6    A gladhand is a device that facilitates the connection of locomotive air braking systems after coupling. If a gladhand is broken, the hoses may not stay connected. The locomotives at issue had seven hoses—one primary hose, called a "trainline" hose, located in the center of the locomotive's front, and six "MU" air hoses, three to each side of the trainline hose. As long as the trainline hose is connected, the engineer can control the air brakes of all the locomotives. The MU hoses are not necessary to exercise this control, but their connection gives the engineer increased control.

¶ 7    During discovery, Tripp served interrogatories on UP pursuant to Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018). The interrogatories included a request to, "Identify any surveillance video, photos or reports of [Tripp's] activities from the date of the alleged occurrence to the present." UP responded, "None known." UP never updated or supplemented this response.

¶ 8    UP moved for summary judgment on the SAA and LIA claims, arguing on the SAA claim that there was no evidence in the record the couplers on UP 8516 and UP 7269 were defective. UP continued that according to Tripp's own deposition testimony, he noticed the knuckles on both UP 8516 and UP 7269 were closed immediately preceding his fall, which led to him attempting to lift the pin to open the UP 8516 knuckle and falling in the process. This, UP contended, demonstrated

4

that Tripp failed to ensure the knuckles were open before the move began, meaning he could not sustain his SAA claim as a matter of law. Moreover, the record showed that the "couplers of both locomotives were inspected after Plaintiff's fall and no defects were found." Finally, UP argued the fact both knuckles were closed is "not indicative of a defect" because "that is how the coupling devices are designed to operate."

¶ 9    Tripp responded to the motion for summary judgment, arguing the record showed he "properly opened the couplers," by opening both knuckles, but they then closed on their own. Tripp emphasized his expert Paul Byrnes' deposition testimony, at which Byrnes opined that one or both couplers were defective because the knuckles should not have raised on their own in the time between moves. Tripp also pointed to the depositions of UP employees Daniel Sloan, who stated that it would constitute a defect for knuckles to raise on their own, and Anthony Aviles, who testified that in his experience locomotive knuckles sometimes raised on their own on the locomotives at Global 1.

¶ 10    The circuit court granted UP's motion for summary judgment on the SAA violation. The court found "the uncontested facts establish that *** the locomotive's coupler was not defective." It cited Tripp's deposition testimony that the couplers "worked properly after his injury," that UP's inspection "revealed no defects," and that "Tripp admitted that his job included making sure that at least one knuckle was open to permit engine coupling." The court concluded, "It is a fair reading of the facts that had Tripp believed the coupler was defective, he would not have attempted to lift the pin. Further, it is a fair reading that Tripp would have succeeded but for his foot slipping off the ladder."

¶ 11    Before trial, Tripp moved for a summary determination that both locomotives were "in use" at the time of the incident, a requirement to trigger the protections of the LIA. On January 2, 2019,

the circuit court granted the motion in part and denied the motion in part. The parties filed an interlocutory appeal on the issue, which this court resolved in favor of Tripp's position. See *Tripp*, 2020 IL App (1st) 1190279.

¶ 12    After Tripp voluntarily dismissed count I on May 25, 2023, the matter moved to trial on the LIA claim only, with opening statements on May 30, 2023. During his opening statement, UP's counsel contended the evidence would show Tripp's "story changed."

¶ 13    Tripp first called Dr. Timothy Lubenow, an anesthesiologist who worked in pain medicine. Lubenow testified that Tripp developed complex regional pain syndrome, or CRPS, due to the injury he suffered on March 10, 2015. Lubenow described the serious impact CRPS would have on Tripp for the rest of his life, including possible symptoms of hypersensitivity, swelling, loss of range of motion, and persistent pain. He confirmed that Tripp often used a cane during his visits with Lubenow.

¶ 14    Lubenow was the lone witness to testify on May 30. Before trial resumed on May 31, Tripp's counsel moved to bar three surveillance videos that UP's counsel had disclosed and produced only the day before. The circuit court asked UP's counsel, "Tell me why you waited until now." UP's counsel said it was "recently done surveillance" from February 16, February 21, and May 10, 2023. Each showed Tripp walking without a cane. UP's counsel said it only conducted the surveillance because the first circuit court judge denied their motion re-depose Tripp, and they did not plan on using the video until "[f]ast forward to the trial, and Mr. Tripp has arrived at trial using a cane with an obvious limp both days that he's been here in front of the jury." UP's counsel also referenced Lubenow's testimony that Tripp walked with a cane during his visits.

¶ 15    Tripp's counsel responded that this constituted "a clear written discovery violation. We requested that they identify this exact type of material, surveillance video. It's not for defense

counsel to determine whether he thinks something is or isn't relevant and at what time it should be disclosed." Counsel continued that UP "should have disclosed [the videos] immediately when they had them, not the day before the plaintiff is going to be testifying." UP's counsel disagreed, claiming "the case law *** says the filming of surveillance is work product until and unless you decide you want to use it."

¶ 16    The court stated, "if I'm going to put [the video] in because I've already made an issue that an important factor that the jury is going to have to determine in this case is the credibility of [Tripp]. I've said that from Day 1." Tripp's counsel interjected, "Judge, during motions *in limine*, we specifically brought this up." The court agreed, and, addressing UP's counsel, said, "I don't remember exactly what you said. I just know you said you didn't have any [surveillance video]," to which UP's counsel replied, "I said we didn't have any that we were going to use. That's right." It appears the court reporter did not transcribe this passage in its reports of proceedings of the motions *in limine*.

¶ 17    The court stated, "I'm going to look at it. But, I mean, if the video impeaches his testimony, it's impeachment. Okay? I think the jury has a right to see that." It ultimately admitted the videos, explaining,

> "The issue is the non-disclosure of surveillance video. Is that a miscarriage of justice? Okay.
>
> The cases do a good job of talking about what is the purpose of cross-examination. How
>
> can the examiner demonstrate that the *** the plaintiff/witness is being untruthful, right?
>
> The examiner *** should not be prevented from having the ability to ascertain the truth.
>
> There's no absolute rule that absolutely everything to be disclosed or it can't be used. There
>
> is no such rule. So the issue is: Is this disclosure at this stage *** a miscarriage of justice?
>
> And I am going to allow them to use this video if they want to in the examination of the

plaintiff. The other issue is the plaintiff hasn't testified yet. It's not like they're springing it in after direct examination. You got it last night."

¶ 18   When trial resumed, Tripp testified that on March 10, 2015, he was at work at Global 1 in his capacity as a conductor when he and Mapp received the task to tie UP 8516 to UP 7269, then "shove them as far westward as we could." Tripp believed performing this task required connecting the trainline hoses between UP 8516 and UP 7269.

¶ 19   Tripp testified about the incident, with his counsel intermittently playing video footage of the Global 1 yard that evening. The video showed that around 2:02 a.m., Tripp and Mapp brought UP 8516 close enough to UP 7269 to couple. Though the couplers failed to connect initially, they successfully connected on the second attempt. Tripp testified that at this point, however, he could not connect the trainline hoses because he discovered a broken gladhand on UP 7269's trainline hose. The video footage did not depict Tripp's discovery of the broken gladhand. Tripp testified the trainline hose connection was necessary so the locomotives could "work as one unit" by allowing the engineer to control the brakes for all five locomotives from a single location. This step is important for safety, Tripp testified, because "You don't want to move engines, move cars without brakes and having somebody standing on the other point because the slack action bouncing back and forth, there's the drawbars and the knuckles, they all move back and forth. And if you don't have those brakes, you're not going to be able to stop them exactly how you want." He continued, "Got to have the trainline. It's not safe to not have a trainline with five engines and moving them." He confirmed he needed to connect the trainline hose specifically, not any of the other six MU hoses.

¶ 20   Because the first move was unsuccessful due to the broken gladhand, he and Mapp regrouped. Mapp decided "to separate [the locomotives], and we'll take the two that are already

together that are safe (UP 7269), put them into the corner and then we will come back, get the three back (UP 8516) and then reconnect them." This second connection would now have to occur over the pit. To execute this move, the two men first moved UP 7269. To do so, Tripp "decoupled" UP 7269 from UP 8516. Tripp and Mapp then moved to UP 8516 and started driving it towards UP 7269's new location over the pit. Tripp stood on UP 8516 itself, the front locomotive of the in-motion three-pack, during this second move.

¶ 21   As UP 8516 neared UP 7269 during the second move, at 2:28 a.m., Tripp noticed the knuckles of each coupler had closed. To correct this issue, Tripp leaned over a ladder to open the knuckle on UP 8516, but in doing so he fell down the ladder stairs and to the bottom of the pit. After the fall, Tripp finished the coupling. He identified a photograph for the jury depicting "the gladhands that [were] not made." Tripp testified that if the trainline gladhand on UP 7269 had not been broken, he and Mapp would not have tried the second move, and he would not have fallen.

¶ 22   Following the incident, Tripp spoke with his manager, Melisa Taylor, and eventually another manager, David O'Hara, took him to an urgent care facility. Tripp returned to work for UP for a short time in a sedentary capacity before his employment ended.

¶ 23   After his diagnosis with CRPS, Tripp attended support groups because CRPS was "depressing." He now wears larger shoes because his "feet swell pretty much constantly when I walk," and he cannot walk barefoot because of the pain. Tripp further stated that he uses a cane "90 percent of the time." He experiences pain at a level of 5 or 6 out of 10 daily.

¶ 24   On cross-examination, Tripp confirmed that he used a cane to walk and had walked with a visible limp during the trial. UP counsel then played the surveillance videos and asked Tripp questions about their content. Tripp confirmed that the videos from February 16 and 21 depicted him walking his dog without using a cane. Similarly, a video from May 10, 2023, showed him,

again without a cane, walking on concrete in his garage. Tripp agreed he did not appear to walk with a limp in any of the three videos. Finally, he confirmed the May 10 video shows him kicking a rock. The surveillance videos were admitted into evidence without further instruction to the jury.

¶ 25   Regarding the incident itself, Tripp agreed the video footage from March 10 did not depict him checking a gladhand. During moves like those at issue, the engineer usually operates the engines at around four miles an hour. Tripp made the decision to position himself on UP 8516 itself during the second move, and agreed he could have positioned himself on the ground instead.

¶ 26   Tripp denied that, following the fall, he admitted he was "distracted" at the time. He acknowledged that on his injury report, he wrote "was making a joint between two engines. Went to step down and lost footing on the step and fell about four feet to concrete slab." He listed the cause as moisture on the steps and handrails, and answered "no" to the question "did working conditions cause or contribute to this accident or injury."

¶ 27   On redirect, Tripp testified that he has good days and bad days in dealing with CRPS. On good days, he can "do a little bit of walking," mow the grass, and "do tasks around the house." He uses the cane in public for stability. On a bad day, he experiences "unbelievable" amounts of pain and lays "in bed for hours."

¶ 28   Tripp introduced the testimony of Jason Webb via deposition. Webb testified in relevant part that at the time of the incident, he worked for UP as a mechanic. He learned of Tripp's fall later that same morning and was assigned to inspect UP 8516. Typically, when workers bring in locomotives for repair to the pit, "they're usually not MU hosed at all. They're usually only train line hosed." He agreed that if the trainline gladhand was broken, that would be unsafe.

¶ 29   Dr. Jeffrey Coe, a physician specializing in occupational medicine, testified that he physically examined Tripp three times. The first exam occurred in December 2017, after which

Coe concluded Tripp might eventually be able to work in a sedentary job. Coe examined Tripp again in May 2018, and concluded Tripp was "permanently disabled from work as a conductor." Coe's last exam occurred in July 2022, after which, due to Tripp's CRPS, Coe concluded that Tripp was "unemployable in a competitive labor marketplace."

¶ 30   Dr. Nadia Webb, a neuropsychologist, testified that in her opinion, Tripp suffered a mild traumatic brain injury (TBI) because of the fall. She explained that Tripp showed "impairments on neuropsychological testing and reporting consistently to three psychologists of *** problems with attention and memory." Dr. Webb further based this opinion on Tripp presenting with "classic symptoms" of TBI following the incident. She also diagnosed Tripp with PTSD.

¶ 31   Finally, Tripp called Robert Johnson, a forensic economist, who testified that Tripp suffered lost earnings with a present cash value of $1,525,513 due to the fall.

¶ 32   In its case-in-chief, UP called Dr. Angelos Halaris, a psychiatrist, who relayed his opinions that (1) Tripp did not suffer CRPS as a result of the fall, and his present condition was due to "preexisting and untreated major depressive disorder, not the result of the of the accident or pain;" (2) Tripp did not suffer from TBI or PTSD; and (3) Tripp's "complaints are largely related to secondary gain," *i.e.* the potential recovery of money from the lawsuit.

¶ 33   Dr. Steven M. Arkin, a neurologist, opined that the incident on March 10, 2015, did not cause Tripp to develop CRPS. Arkin contended that Tripp suffered from degenerative joint disease, which can mimic CRPS symptoms and also pointed to a foot injury Tripp suffered in June 2015 that could have independently caused CRPS to develop. Moreover, Tripp's medical records indicated a history of opioid use, which Arkin characterized as "persistent usage throughout the years" from 1991 to 2023. This usage level gave Arkin concern that Tripp may be dependent on opioids, which could cause him to inaccurately report pain symptoms.

¶ 34   O'Hara, who worked for UP as director of road operations at the time of the incident, testified generally about Tripp's training with UP, including working with couplers and the proper way to traverse ladders. He explained that when an employee finds a broken piece of equipment, he must inform the "manager on duty or the mechanical employee that can make proper repairs to the equipment." It is the conductor's job, not the engineer's, to decide how to move locomotives on the yard, and the conductor's responsibility to ensure a coupler's knuckle is open before coupling. O'Hara was present on March 10, 2015, and interacted with Tripp following the incident, including driving him to an urgent care facility. When he first encountered Tripp that day, he asked what happened, and Tripp said, "Tripp tripped," after which they both laughed. Tripp did not mention a broken gladhand or coupler issue in relation to his fall.

¶ 35   Foster Peterson, a consultant who works in the railroad industry, testified as an opinion witness for UP on "operating and safety rules involved in making movements like in the ones involved here and also the mechanical condition of the locomotives that were involved in this incident." In his opinion, the fall occurred because Tripp stepped sideways on the ladder instead of "facing it and backing it down," per UP's rules. Peterson testified that an inspection report for UP 7269 listed a broken gladhand on "an MU air hose," though it did not specify which one. Jason Webb signed the report. Peterson spoke with Webb in developing his opinions, and Webb told Peterson "that if he entered MU air hose, that means it was an MU air hose."

¶ 36   Peterson further opined, over objection, that the three-pack including UP 8516 had enough braking power to safely complete the task Tripp and Mapp were assigned without a trainline hose connection with UP 7269. He explained that "there were multiple options available to make these movements," and, in his opinion, UP 8516 and UP 7269 did not need to be connected by any hose to complete the assigned task because "shoving" would have been safe at a low speed.

12

¶ 37    On cross-examination, Peterson testified that UP personnel discovered the broken gladhand six hours after the incident. He did not agree that it would have been unsafe for Tripp and Mapp to complete their task while UP 7269 still had the broken gladhand. Tripp's counsel played a portion of Jason Webb's deposition in which he explained that when completing the electronic form on which he described finding a "broken gladhand" on a MU air hose, the term "MU air hose" was used in the system to refer to any of the seven brake hoses, including a trainline hose.

¶ 38    Taylor testified that she was Tripp's direct supervisor at the time of the incident. Regarding tasks like the one Tripp and Mapp were assigned on March 10, 2015, UP's rules only required that Tripp "provide protection ahead of the movement," which he could have done from the ground instead of while positioned on the moving locomotive. Immediately following the fall, Taylor discussed the incident with Tripp, who told her he "missed a step" and "had a lot going on" because "he was getting married the next day." Tripp did not mention the couplers or a gladhand. On cross-examination, Taylor testified "there are circumstances where the gladhands will not be connected because we're moving [the engine] to the service track for a repair." She did not know why Tripp and Mapp were asked to move the locomotives to the pit on March 10, 2015.

¶ 39    Jeff Alaniz testified that he worked for UP in a risk management position in March 2015. He inspected UP 8516 on March 10, 2015. Alaniz viewed and photographed the ladder from which Tripp fell, and did not notice any unsafe conditions on the ladder. Alaniz spoke with Tripp at the urgent care facility. Tripp only told him that he missed a step and fell from the ladder. Alaniz did not speak to Mapp about the incident because "Tripp indicated directly to me exactly what had happened, and that he had missed a step and fell."

¶ 40    Sloan, director of locomotive maintenance for UP, testified that he worked as a manager for UP at the time of the incident. Global 1 had a rule restricting locomotives to five miles per hour in

the "mechanical servicing area," where Tripp's incident occurred. Sloan testified "in this scenario *** we were trying to move five locomotives. The rule states, within a mechanical facility, that you only need one set of air brakes until you have six." He explained that only one locomotive's air brakes were needed to complete the move.

¶ 41    Sloan reviewed the inspection and repair records of UP 7269. He stated that if there was an issue with the trainline hose, it would be described by an entry in the records, but no such entry existed. Sloan confirmed that the March 10 entry for UP 7269 only references replacing a gladhand on an MU air hose, not the trainline hose. He knew this because if the broken gladhand had been on a trainline hose, the entry in the records would contain a comment that read, "trainline" or "brake pipe." Sloan further explained, "You cannot replace a gladhand on a trainline, you can only replace gladhands on MU air hoses." To replace a gladhand on a trainline, UP "would replace the entire hose," and the entry would read, "Trainline hose replaced." The records further demonstrated that no defects were reported on the UP 7269 trainline hose from September 10, 2014, to April 10, 2015.

¶ 42    On cross-examination, Sloan described the second move as "extremely inefficient" and was "critical" of the decision to undertake it, because there was no need to uncouple the locomotives because it would have been "perfectly safe" to push the locomotives without a trainline hose connection. He was "disappointed" Jason Webb did not specify on which MU hose he replaced the gladhand in the inspection record.

¶ 43    Kristi Girard-Deardorff, a UP employee who worked in the health and medical services department, testified that UP offered Tripp assistance with "vocational rehabilitation," which he declined. She believed there were "multiple positions" he could have filled while sedentary.

¶ 44    UP rested, and before closing arguments, the circuit court barred rebuttal evidence that Tripp sought to admit. The proposed rebuttal consisted of additional testimony from Jason Webb's deposition, in which Webb stated he replaced an entire hose in connection with the broken gladhand he discovered on UP 7269. Tripp argued the testimony rebutted Sloan's testimony that the broken gladhand was on an MU hose, not the trainline hose.

¶ 45    During closing arguments, counsel for UP stated, "You see, this case seems to be really about two Mr. Tripps." Counsel argued Tripp's statements on not paying attention to his step and being preoccupied with his wedding was "the credible" and "responsible Mr. Tripp," while the "[Tripp] that we see in the surveillance video *** where we can see that these reports of pain he's been making to his doctors and claiming in this lawsuit are simply not credible." Counsel stated credibility was "vitally important."

¶ 46    The jury returned a verdict for UP on June 6, 2023. The circuit court later denied Tripp's posttrial motion, and this appeal followed.

¶ 47                                    JURISDICTION

¶ 48    The circuit court denied Tripp's posttrial motion on September 15, 2023, and he filed his notice of appeal on October 11, 2023, giving this court jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 49                                    ANALYSIS

¶ 50                                    I. LIA Claim

¶ 51    On appeal, Tripp raises multiple challenges to the circuit court's evidentiary decisions at trial and further alleges the circuit court judge was biased against him. His evidentiary claims can be summarized as the court erroneously permitting evidence and argument in the following areas:

(1) Tripp's conduct after allegedly discovering the broken gladhand, as such evidence was relevant only to the improper issue of Tripp's contributory negligence; (2) whether the locomotive was "in use" per the LIA, as this issue had already been determined by this court in Tripp's favor, and was the subject of multiple motions *in limine* from Tripp that the court granted; and (3) Tripp's credibility. He further argues that (1) multiple witnesses were permitted to offer undisclosed opinions in violation of Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018); (2) the court erred by barring certain rebuttal evidence intended to rehabilitate his credibility; and (3) the court erred in giving and denying certain jury instructions. Finally, Tripp argues that the first circuit court judge erred by granting summary judgment on Count II.

¶ 52    UP responds that the jury rendered a general verdict, and Tripp did not pose special interrogatories, meaning this court must operate under the presumption that the jury ruled in UP's favor on every defense it raised, and must affirm the verdict if Tripp cannot demonstrate reversible error defeating every defense. See *Steed v. Rezin Orthopedics and Sports Medicine*, 2021 IL 125150, ¶ 36. The record supports UP's position, and we proceed accordingly. We note that Tripp's argument in his reply brief that the general verdict rule only applies to jury instruction cases is a misstatement of the law, as Illinois courts routinely apply it in other contexts. See *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 46.

¶ 53    The record shows that UP raised the following defenses at trial:[2]

> (1) There was no LIA violation because the broken gladhand was on an MU hose, not the trainline hose, and the locomotives were not unsafe in that condition;

---

[2] Tripp also argues in his reply brief that the general verdict rule should not apply because he only brought a single claim. This is a misstatement of the law because UP raised distinct defenses regarding (1) violation of the LIA and (2) causation, any one of which the jury could have relied on to rule in UP's favor. See *Robinson v. Boffa*, 402 Ill. App. 3d 401, 407 (2010).

(2) There was no LIA violation because the locomotives were not in an unsafe condition even if the trainline gladhand was broken, as a shoving maneuver could have been used to successfully complete the assignment; and

(3) Tripp's conduct was the sole proximate cause of his injury.[3]

¶ 54    Each of these defenses is a question of fact on which Tripp provided evidence in the form of his testimony. Tripp's version was that the broken gladhand was on the UP 7269 trainline hose, preventing connection of the trainline hoses, which was necessary to complete the move safely as initially planned. UP contends the gladhand was on an MU hose, meaning the trainline hoses could have been connected; and even conceding it was not, the move could be safely done without the connection. Similarly, Tripp maintains that but for the broken gladhand, he never would have fallen because it made the second move necessary, while UP contends it was Tripp's conduct which was the sole proximate cause of his fall because his decision making broke the causal link. Given this posture, Tripp's credibility claims are a threshold issue in this appeal, as if any of Tripp's claims regarding evidentiary error that affected his credibility constitutes reversible error, that reversible error would defeat each of the defenses presented by UP at trial.

¶ 55    We begin with the circuit court's decision to admit the surveillance videos. Illinois discovery rules are mandatory, and the failure to follow the rules provides grounds for sanctions. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 38. Relevant here, Rule 213 requires that when responding to interrogatories, a party must provide sworn responses and must

---

[3] UP attempts to argue on appeal that it also presented independent defenses to the jury of (1) Tripp suffered no injury, and (2) there was no violation of the LIA because UP complied with a federal regulation which permits locomotives to be moved while in an unsafe condition if the move is solely for the purpose of repair, but the record does not support either theory. See 49 C.F.R. § 229.9 (2025). First, UP conceded that Tripp suffered at least some injury from the fall at trial. Second, there was no evidence at trial that UP 7269 or UP 8516 were being moved "solely" for repair, meaning the regulation does not apply.

supplement answers when information changes. Ill. S. Ct. R. 213(d), (i) (eff. Jan. 1, 2018). This is an ongoing duty through the pendency of litigation. *Id.*

¶ 56 The decision of what sanction to impose for a discovery violation is within the discretion of the circuit court. *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 127. Factors the court is to consider are (1) the surprise to the opposing party; (2) the prejudicial effect; (3) the diligence of the opposing party in seeking discovery; (4) timely objection; and (5) the good faith of the party seeking to admit the evidence. *Carlson v. General Motors Corp.*, 9 Ill. App. 3d 606, 619-20 (1972); *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 110 (2004). We will not reverse a circuit court's discovery sanction decision absent an abuse of discretion, which occurs where the court's decision was arbitrary or fanciful, or no reasonable court would take the position taken by the lower court. *Brown v. Illinois State Police*, 2021 IL 126153, ¶ 49.

¶ 57 The record shows that Tripp requested that UP identify any surveillance video in its interrogatories, and UP denied any such video existed in response, replying, "none known." UP never supplemented this response in writing. Next, during argument on motions *in limine*, UP's counsel affirmatively represented they did not have any surveillance video, a representation the circuit court judge confirmed, though defense counsel offered the caveat that he actually said they had no surveillance video "they were going to use." There is no dispute counsel did not acknowledge that UP possessed surveillance video at the time he made these comments.

¶ 58 After trial began, UP revealed that it did, in fact, possess surveillance videos dating back to February 2023, three months before trial began. The circuit court acknowledged UP failed to disclose the existence of the videos in discovery, then debated that despite this discovery conduct, whether admitting the videos would constitute "a miscarriage of justice," ultimately deciding it would not.

¶ 59   We find that UP's conduct constituted a violation of the Illinois Supreme Court rules. UP stated "none known" in the response to Tripp's request for any surveillance video, then failed to amend its interrogatories, as required by Rule 213, after it knew of surveillance videos. The discovery rules are mandatory. *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 38. Rule 213 imposes a duty to supplement, meaning UP cannot appeal to the fact that the videos post-dated its initial interrogatory responses. Ill. S. Ct. R. 213(i) (Jan. 1, 2018). Additionally, UP committed another discovery violation when UP's counsel failed to identify the existence of the videos during motions *in limine*.

¶ 60   Next, we find the circuit court abused its discretion by not barring the surveillance video as a sanction for the above discovery violations. The factors Illinois courts consider when deciding whether a discovery sanction is appropriate weigh heavily in favor of barring the videos. The level of surprise could not be higher, as UP hid the existence of the video until after trial began.

¶ 61   The prejudicial effect is severe; as the circuit court acknowledged, Tripp's credibility was at the very center of the case, as it was his account alone that relayed the circumstances of the fall and the decision-making process underlying the second move. Mapp did not testify, and the video did not depict the moment where Tripp claimed to have discovered the broken trainline gladhand. Any damage to Tripp's credibility such that the jury was unlikely to accept his version was potentially fatal in these circumstances. Indeed, UP's counsel referenced the video in his closing argument multiple times.

¶ 62   On the third and fourth factors, there is no dispute, and UP does not challenge, that Tripp did not diligently pursue discovery of the surveillance videos or fail to make a timely objection to their admission. See *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273, 284-85 (1982).

¶ 63    On the fifth factor, UP did not claim that it forgot about the interrogatory, or that a clerical error prevented them from acknowledging the video in a timely fashion. Instead, well after the videos were taken, and days before trial began, with their inaccurate interrogatory response still the official record, UP's counsel again chose not to acknowledge it had surveillance video despite being asked about the issue directly by the circuit court judge. This is the type of conduct our supreme court has specifically, and repeatedly, warned Illinois attorneys against. See *Buehler v. Whalen*, 70 Ill. 2d 51, 67 (1977). See also, *Williams v. A.E. Staley Manufacturing Co.*, 83 Ill. 2d 559, 566 (1981) ("Discovery is not a tactical game, and [the Rules] provides remedies against unreasonable opponents. Discovery is intended to be, and should be, a cooperative undertaking by counsel and the parties *** for the purposes of ascertaining the merits of the case.)

¶ 64    Finally, we find the proper remedy for this error is to remand for a new trial. There is no dispute that Tripp's credibility was of central importance to the case, and this evidence went directly to his credibility, with UP's counsel emphasizing it in his closing argument. On this record, we cannot rule out that the videos impacted the jury's verdict such that permitting the verdict to stand would be appropriate. See *Ashpole v. Brunswick Bowling and Billiards Corp.*, 297 Ill. App. 3d 725, 729-30 (1998). This finding is consistent with other Illinois cases which have remanded for new trials due to the lower court's failure to appropriately sanction a party for discovery violations. See *In re Marriage of Daebel*, 404 Ill. App. 3d 473, 486-88 (2010) (reversal was appropriate where circuit court's sanction was too light); *Firstar Bank of Illinois v. Peirce*, 306 Ill. App. 3d 525, 536-37 (1999) (failure to bar evidence constituted grounds for reversal); *Warrender v. Millsop*, 304 Ill. App. 3d 260, 269-71 (1999); see also *Delvecchio v. General Motors Corp.*, 255 Ill. App. 3d 189, 197-203 (1993) (affirming grant of a new trial based on intentional discovery violation in withholding responsive documents).

¶ 65    UP argues that disclosure of surveillance video is protected by the work product privilege until a party decides to use it, citing *Horn v. Northeast Illinois Regional Commuter Ry. Corp.*, 2022 IL App (1st) 210268, ¶ 34, and Illinois Supreme Court Rule 201(b)(3) (eff. Mar. 17, 2023). UP cannot cite to this authority, however, because it never acknowledged that the videos existed and provided a privilege log. See Ill. S. Ct. R. 201(n) (Mar. 17, 2023)); *Horn*, 2022 IL App (1st) 210268, ¶¶ 5-6.[4]

¶ 66    UP next contends it was entitled to withhold the video because Illinois law permits parties to withhold materials to be used for cross-examination or impeachment, citing *Yanello v. Park Family Dental*, 2017 IL App 3d 140926, *Stapleton ex rel. Clark v. Moore*, 403 Ill. App. 3d 147 (2010), and *Southern Illinois Airport Authority v. Smith*, 267 Ill. App. 3d 201 (1994). The propositions from these cases are inapplicable.

¶ 67    In *Yanello*, the court stated, in regard to the cross-examination of an expert witness, "the defendants were not required to produce the Association's code prior to trial pursuant to Supreme Court Rules 213, 214, or 237 because they used the Code provisions during cross-examination for impeachment purposes only, not as substantive evidence." *Yanello*, 2017 IL App (3d) 140926, ¶ 47. In *Stapleton*, the court wrote, "The disclosure requirements of Rule 213 simply do not apply

---

[4] The *Horn* court discussed *Wiker v. Pieprzyca-Berkes*, 314 Ill. App. 3d 421, 429-30 (2000), where the court denied that the plaintiff deserved a new trial where the defendant never "disclosed" surveillance video it did not ultimately use at trial. *Wiker* is of limited use here because the court did not discuss what response the defendant made to the plaintiff's discovery request, and does not distinguish between "disclosure" and "production." *Id.* To the extent *Wiker* can be understood as analogous, we emphasize that to claim privilege from disclosure under Rule 201(b)(3), the party has to acknowledge the existence of the requested material it is withholding as privileged. Indeed, the *Wiker* court cites for proposition that disclosure was not required there to a scholarly article which emphasized the requirement that surveillance videos must be acknowledged and listed on a privilege log if requested in discovery. *Id.* at 430 (citing D. Minichello, *Use and Abuse of Surveillance Videos*, 85 Ill. B.J. 22, 24 (1997) (if "the plaintiff issues interrogatories aimed at determining the existence of surveillance materials, a defendant claiming work product privilege must, pursuant to Rule 201(n), prepare a detailed privilege log, which will make the existence of the materials apparent.")).

to cross-examination of an opposing party's opinion witness. *Stapleton*, 403 Ill. App. 3d at 156. And in *Southern Illinois*, the court, addressing "documents used in cross-examination only," stated that non-disclosure of requested materials may be permissible for "documents to be used solely in cross-examination that are within the public domain and equally available to both parties." *Southern Illinois*, 267 Ill. App. 3d at 206-07. This body of law does not impact our resolution, as this case does not present issues of cross-examination of an expert witness, or cross-examination with a document in the public domain.

¶ 68    Finally, UP argues that even if its late disclosure was improper, Tripp suffered no prejudice because UP produced the video before Tripp testified. This argument fails because the late production occurred well after trial started. Breaking the rules but claiming no damage occurred because the other side had hours to react is not commensurate with the letter or intent of the Illinois Supreme Court rules, and permitting UP to use the surveillance video based on this argument would only encourage the conduct our Supreme Court has specifically sought to dissuade. See *infra* ¶ 64; see also *Ashpole*, 297 Ill. App. 3d at 729-30 (the mid-trial disclosure of witness was sufficiently prejudicial to necessitate new trial).

¶ 69    We note this order should not be interpreted as finding the surveillance videos were generally inadmissible or irrelevant—this is strictly an issue of UP's counsel's conduct in disregarding the discovery rules. If UP's counsel wanted to use the surveillance videos, the Illinois Supreme Court Rules were clear on what was required. Thus, we remand for a new trial. Because we remand, we need not address Tripp's other arguments arising from the trial.

¶ 70                                 II. SAA CLAIM

¶ 71    Tripp's final claim is the first circuit court judge erred by granting summary judgment on his SAA claim. Summary judgment is appropriate where the record shows there is "no genuine

22

issue as to any material fact" and the "the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). A genuine issue of material fact exists where there is a dispute concerning material facts, or when those facts, though undisputed, could lead to multiple reasonable inferences. *Lewis v Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. "The purpose of summary judgment is not to try a question of fact, but, rather, to determine whether a genuine issue of material fact exists." *Id.* ¶ 14. Summary judgment is a "drastic means of disposing of litigation, and therefore, should be granted only where the right of the moving party is clear and free from doubt." *Id.* ¶ 15. We review a grant of summary judgment *de novo*. *Id.*

¶ 72    The SAA states in relevant part that railroad carriers like UP must provide its employees with a vehicle equipped with "couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles." 49 U.S.C. § 20302 (1994). To establish a SAA violation, a plaintiff railroad employee must either (1) "provide evidence that two cars failed to couple automatically upon impact" or (2) "show a defect in the coupling equipment." *DeBiasio v. Illinois Central R.R.*, 52 F.3d 678, 683 (7th Cir. 1995). Regarding the second theory, "direct evidence of a defect obviates the need to determine whether the [SAA] was violated by a failure to couple on the occasion in question." *Id.* The railroad may present a valid defense to a SAA claim based on the first theory by showing the couplers were not placed in a position to couple on impact. *Affolder v. New York, Chicago & St. Louis R.R. Co*, 339 U.S. 96, 99 (1950); see also *Norfolk and Western Ry. Co. v. Hiles*, 516 U.S. 400, 410 (1996) ("We think *Affolder's* restriction on failure-to-perform liability logically extends to every step necessary to prepare a non-defective coupler for coupling").

¶ 73    The record on summary judgment contained Tripp's deposition testimony that he opened the knuckles on both UP 7269 and UP 8516 after discovering the broken gladhand, then he and

Mapp separated the two-pack from the three-pack. Minutes later, Tripp and Mapp started the second move, guiding UP 8516 towards UP 7269 over the pit, when Tripp discovered both knuckles were now closed. Aviles testified that the knuckles on locomotives in the yard sometimes raised on their own. Both Byrnes and Sloan testified that a knuckle raising on its own would indicate a defect in the coupler. Inspections of both couplers after the incident revealed no defects, and Tripp confirmed that they were able to complete the coupling moments after his fall.

¶ 74    Based on this record, we find there was a dispute of material fact over whether one or both couplers had a defect causing the knuckle to raise on its own. The existence of this material dispute makes summary judgment improper, and we accordingly reverse the grant of summary judgment and remand such that Tripp may also pursue his SAA claim at his new trial. *Lewis*, 2020 IL 124107, ¶¶ 14-15. Tripp introduced evidence through his deposition that the knuckles raised on their own, and Byrnes testified that Tripp reasonably concluded the knuckles were open at the time of the incident because he had opened them himself recently, making the fact they were closed indicative of a defect. Sloan also testified that if the knuckles raised on their own, that would constitute a defect. UP does not challenge the admissibility or even the existence of this evidence; instead, it points to the fact that its own inspections revealed no defects, and case law discusses that knuckles occasionally rise on their own due to common usage, which is not indicative of a defect. See *United Transportation Union v. Lewis*, 711 F.2d 233, 235, n.5 (D.C. Cir. 1983). It also contends there was no direct evidence, making the theory that the knuckles raised on their own instead of due to common usage overly speculative.

¶ 75    Based on the above, this is a case where each side has presented evidence and inferences supporting its position regarding whether a defect existed that, if accepted by the jury, could lead to judgment in their favor. Which version was more likely was an issue of fact for the factfinder

and should not have been resolved by the circuit court deciding which "fair reading" of the facts it decided to favor. *Lewis*, 2020 IL 124107, ¶ 15 (summary judgment is inappropriate when "reasonable persons might draw different inferences from the undisputed facts); see also *Welch v. New York, Chicago & St. Louis R.R., Co.*, 5 Ill. App. 2d 568, 574 (1955) (jury could accept plaintiff's version that a brake defect existed to support verdict in favor of plaintiff on a SAA violation claim).

¶ 76    In closing, we note the parties discuss the *Affolder/Hiles* defense, which states that a railroad has a good defense to liability under the SAA if it can show the couplers were not in a proper position to couple. This defense does not defeat summary judgment here, however, because Tripp presented sufficient evidence to establish a dispute of material fact respecting the existence of a defect, the second theory of liability for SAA claims, and the *Affolder/Hiles* defense applies to claims under the first theory. See *Hiles*, 516 U.S. at 410 (explaining the "restriction on failure-to-perform liability extends to every step necessary to prepare a non-defective coupler for coupling."). The *DeBiasio* court also recognized this limitation, explaining that a railroad defendant "cannot be held liable when it utilizes equipment that complies with the statutory mandate and thus couples automatically upon impact *and is not defective*." (Emphasis added.) *DeBiasio*, 52 F.3d at 684.

¶ 77                                          CONCLUSION

¶ 78    For the reasons above, the jury's verdict in favor of UP on the LIA claim, and the circuit court's order granting summary judgment on the SAA claim, are both reversed, and the matter is remanded for a new trial at which Tripp may pursue both claims. On remand, our decision does not preclude the use of the three surveillance videos that UP's counsel failed to disclose prior to trial.

¶ 79    Reversed and remanded with instructions.